IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION


ROBERT L. SMITH                                                    PLAINTIFF

                    v.                    Civil No. 10-3025

MICHAEL J. ASTRUE, Commissioner of
Social Security Administration                                     DEFENDANT

**MEMORANDUM OPINION**

## I.     Factual and Procedural Background

Plaintiff, Robert L. Smith, appeals from the decision of the Commissioner of the Social Security Administration denying his applications for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"), pursuant to §42 U.S.C. 405(g).

Plaintiff protectively filed his DIB and SSI applications on December 4, 2003, alleging a disability onset date of November 23, 2003, due to residual chest pain following a four-wheeler accident, shortness of breath, dizziness, depression, and back, neck, and shoulder pain. Tr. 14, 49-51, 287-291, 462-483. At the time of the onset date, Plaintiff was thirty-eight years old with a seventh grade education. Tr. 82, 355, 398, 514. He has past relevant work as land surveyor. Tr. 71, 93-96, 101, 463-466, 514.

Plaintiff's applications were denied at the initial and reconsideration levels. Tr. 29-30, 36-37, 294-295, 301-303. At Plaintiff's request, an administrative hearing was held on October 13, 2005. Tr. 304-336. The ALJ rendered an unfavorable decision on September 26, 2006. Tr. 11-22. Subsequently, the Appeals Council denied Plaintiff's Request for Review, thus making the ALJ's decision the final decision of the Commissioner. Tr. 5-7.

On June 22, 2007, Plaintiff filed an action in this Court seeking judicial review of the administrative decision. *Smith v. Astrue,* 3:07-cv-03027-JLH (W.D. Ark. closed June 24, 2008). By order dated June 24, 2008, Plaintiff's case was remanded to the Commissioner for further development. *Id.*, ECF No. 9. Following remand, an additional administrative hearing was held on March 26, 2009. Tr. 391-431. Plaintiff was present at this hearing and represented by counsel. Tr. 391-431. The ALJ rendered an unfavorable decision on December 16, 2009, finding that Plaintiff was not disabled within the meaning of the Act. Tr. 343-357. Plaintiff now seeks judicial review of that decision.

## II.  **Medical History**

On November 23, 2003, Plaintiff was admitted to Baxter Regional Medical Center after he was involved in a four wheeler accident, in which he sustained a sternal fracture and a laceration to his left eye. Tr. 118-127. Plaintiff denied loss of consciousness. Tr. 121. Chest x-rays revealed a nondisplaced mid-sternum fracture with no evidence of effusion or pneumothorax. Tr. 119, 122-123. Plaintiff's lungs were expiratory with some bibasilar atelectasis. Tr. 122-123. No other bony abnormalities were identified, and the vascularity and cardiac silhouette were within normal limits. Tr. 122-123. Plaintiff's left facial laceration was repaired. Tr. 119-121. An electrocardiogram ("ECG") revealed normal findings. Tr. 120. Additionally, telemetry and initial cardiac markers were negative. Tr. 120. Plaintiff was discharged in stable condition on November 24, 2003. Tr. 126.

On November 25, 2003, Plaintiff presented to Caleb O. Gaston, M.D., with complaints of chest pain and shortness of breath. Tr. 200. Upon examination, Dr. Gaston noted shallow breathing, but good air movement, and tenderness over the inferior portion of the sternum. Tr. 200. Chest x-rays revealed a mid to inferior sternal fracture, a right lower lobe infiltrate versus hematoma, and a

right rib fracture.  Tr. 200.  Dr. Gaston prescribed Percocet, Zithromax, and recommended a deep breathing routine to prevent pneumonia.  Tr. 200.  The following day, Dr. Gaston also prescribed a Duragesic patch for pain control.  Tr. 199.

On November 29, 2003, Plaintiff was readmitted to Baxter Regional with complaints of sharp chest pain, lightheadedness, and shortness of breath.  Tr. 128-173.  Chest x-rays revealed borderline cardiomegaly, suggestive evidence of pulmonary venous hypertension, and probable subsegmental atelectasis in the basilar aspect of the right lower lobe.  Tr. 162.  A chest CT revealed a thickened pericardium with fluid, possibly air, and a right pleural effusion with some atelectasis with a non-displaced sternal fracture.  Tr. 129, 133.  An ECG was consistent with pericarditis.  Tr. 133, 169-172. Cardiac markers were negative.  Tr. 133.  Plaintiff's sedimentation rate was elevated to 32.  Tr. 137, 165.  Plaintiff was assessed with pericarditis, probably secondary to myocardial contusion suffered in the accident.  Tr. 135.

On November 30, 2003, John Gocio, M.D., a cardiologist, examined Plaintiff and found a small amount of hematoma in the pericardum and hematoma around the pulmonary artery and the aorta.  Tr. 136.  He also found evidence of pulmonary contusion and hematoma in the right pleural space, but not a great deal of fluid.  Tr. 136.  Dr. Gocio assessed Plaintiff with a mediastinal contusion, more consistent with venous extravasation.  Tr. 137.  He noted there was no significant arterial injury, but Plaintiff would need to be observed.  Tr. 137.  An echocardiogram ("ECHO") revealed moderate pericardial effusion without evidence of tamponade physiology, but normal left ventricular function and no evidence of aortic valvular disease.  Tr. 153-154.  A chest CT revealed a moderately comminuted, mildly impacted fractured sternum, a probable mixture of small pneumopericardium and hemopericardium with minimal tamponade effect, suggestive evidence of

-3-

possible occult or subclinical laceration of the aortic trunk, and subsegmental atelectasis of the right lower lobe associated with hemothorax.  Tr. 160-161.

On December 1, 2003, Plaintiff underwent an arch aortogram, a coronary angiography, and a pulmonary angiography, all of which yielded normal results.  Tr. 151-152.  Chest x-rays revealed mild fullness of the heart and upper mediastinum and an area of increased density involving the left base, possibly consistent with a pulmonary contusion.  Tr. 158-159.  A CT of Plaintiff's chest revealed increasing pleural effusions, larger on the right, and effusion and atelectasis on the left.  Tr. 156.  A small amount of clot was noted around the base of the aorta, but there was no definite dissection.  Tr. 156.  As a result, Dr. Gocio performed a thoracentesis to remove fluid from Plaintiff's chest.  Tr. 149-150.  Plaintiff tolerated the procedure well.  Tr. 150.  Progress notes from December 1, 2003, reveal that Plaintiff was "clinically better" and his pericarditis was "slowly improving."  Tr. 144.  Additionally, an ECG, performed on December 4, 2003, revealed normal left ventricular function and improved pericardial effusion without evidence of pericardial tamponade.  Tr. 147-148.  At this time, Plaintiff was discharged from the hospital with prescriptions for pain medications.  Tr. 173, 178.

On December 10, 2003, Plaintiff presented to Baxter Regional with complaints of increasing shortness of breath and chest pain.  Tr. 174-193.  Upon examination, Dr. Gaston noted some crackles in the left lung base and fair air movement, although Plaintiff did not take in a very wide inspiration.  Tr. 177.  Dr. Gaston also noted some tenderness over the mid-sternum.  Tr. 177.  A chest x-ray revealed an enlarged heart, infiltrate in the left lower lobe suggestive of pneumonia, some atelectasis in the right base, and pleural effusions, greater on the left.  Tr. 178, 185, 198.  Plaintiff was referred to Otis Warr, M.D., a cardiologist.  Tr. 178-179.  Upon examination, Dr. Warr noted that Plaintiff

was tachycardic and had an audible rub.  Tr. 179.  He also noted that Plaintiff had lung crackles bilaterally.  Tr. 179.  An ECHO revealed moderate pericardial effusion, unchanged from prior studies.  Tr. 178, 183.  An ECG revealed sinus tachycardia with nonspecific STT changes, improved from Plaintiff's prior admission.  Tr. 179, 191.  Dr. Warr assessed Plaintiff with probable pericarditis and possible pleuritis, and prescribed Indocin.  Tr. 179.  On December 11, 2003, Plaintiff's pericarditis had improved with the use of Indocin.  Tr. 181.  On December 12, 2003, Plaintiff was discharged in stable condition.  Tr. 175, 192.

Following his hospitalization, Plaintiff saw Dr. Gaston at North Central Arkansas Medical Associates.  Tr. 194-202.  On December 29, 2003, Plaintiff stated that he had improved since his hospitalization, but continued to have some chest pain and shortness of breath.  Tr. 196.  Upon examination, Plaintiff's chest was clear to auscultation and he was breathing easily.  Tr. 196.  He had a regular heart rate and rhythm without murmur.  Tr. 196.  At this time, Dr. Gaston refilled Plaintiff's prescription for Percocet.  Tr. 196.

In a letter dated December 30, 2003, Dr. Gaston opined that Plaintiff's prognosis for "working anytime soon is quite poor."  Tr. 197.  He anticipated that Plaintiff would need a full twelve months of rehabilitation before he would be capable of any work.  Tr. 197.

On February 20, 2004, Plaintiff saw Dr. Warr for a follow-up appointment.  Tr. 203-207.  Plaintiff stated he was having some "mild popping" and chest pain in his sternum, but his breathing had greatly improved.  Tr. 203.  An ECG yielded normal results with normal sinus rhythm.  Tr. 204, 207.  Dr. Warr recommended that Plaintiff continue using non-steroidal-anti-inflammatory medication ("NSAIDs") as needed for chest discomfort.  Tr. 205.

-5-

On May 27, 2004, Plaintiff presented to R. Doug Foster, M.D., an orthopaedist, with complaints of posterior thoracic and sternal pain. Tr. 270. A thoracic MRI showed some mild dessication and disc narrowing at T4-T5, but was otherwise unremarkable. Tr. 269, 271. An MRI of Plaintiff's chest and sternum was normal, with no apparent fracture, subluxation, edema, or destructive lesions, and no apparent masses or hematomas. Tr. 272. On July 24, 2004, Dr. Foster noted that Plaintiff had evidence of a sternal nonunion with pain, catching, and popping in the sternal area. Tr. 269. He referred Plaintiff to Dr. Gocio for surgical evaluation. Tr. 269.

In a letter dated July 12, 2004, Dr. Gocio noted that x-rays and an MRI of Plaintiff's chest were normal. Tr. 253. On physical examination, he could not appreciate any deformity, stepoff, or clicking. Tr. 253. Dr. Gocio noted that Plaintiff could "pop his ribs on the side," but he could not reproduce the sound. Tr. 253. It was his belief that Plaintiff had possible injury to the costal cartilages or the sternal junction with the costal cartilages, an area which "notoriously does not heal well." Tr. 253. In a follow-up letter dated July 26, 2004, Dr. Gocio noted that he saw Plaintiff to review a bone scan and tomograms of the sternum and ribs. Tr. 211-216. Tomography revealed no fractures. Tr. 211, 213, 258. However, calcification and changes in the costal cartilages on the right parasternal area were noted. Tr. 213, 258. Additionally, Plaintiff's bone scan was abnormal, showing increased activity involving the sternomanubrial joint and the mid and lower portions of the sternum, more pronounced on the right. Tr. 211-212, 259. It was Dr. Gocio's opinion that the "clicking" Plaintiff experienced was disrupted cartilage and he could offer nothing surgical to alleviate the problem. Tr. 211. Dr. Gocio recommended continued treatment with NSAIDs. Tr. 211. He also noted that Plaintiff had filed for disability, and "if he truly has pain and is unable to work, this will be a serious consideration for him." Tr. 211.

On December 17, 2004, at the request of his attorney, Plaintiff presented to Vann A. Smith, Ph.D., for a neuropsychological evaluation. Tr. 218-225. Plaintiff related the history of his four wheeler accident and residual pain. Tr. 218. Upon examination, Plaintiff was oriented in all spheres. Tr. 219. His recall/declarative memory was impaired, but his judgment and insight were grossly intact. Tr. 219. Plaintiff's affect was flexible and full-ranging and his mood was mildly anxious and dysthymic. Tr. 219. His narratives were fluent, logical, and informative, although somewhat pressured and circumstantial at times. Tr. 219. No abnormal thought processes or hallucinatory/delusional phenomena were observed. Tr. 219. Plaintiff denied suicidal or homicidal ideation.

On the Wechsler Adult Intelligence Scale-Revised, Plaintiff received a verbal IQ of 91, a performance IQ of 98, and a full-scale IQ of 93, which placed him within the average range of intelligence. Tr. 219. Dr. Smith found no evidence of ongoing psychotic illness, disabling anxiety disorder, addictive disease, or personality pattern disturbance. Tr. 221. However, he found the presence of bilateral, diffuse, organic brain dysfunction of mild to moderate severity and static to slowly progressive velocity. Tr. 221. He also found that Plaintiff suffered from traumatic brain insult as a result of his accident, and it was his opinion that Plaintiff was disabled. Tr. 221. Dr. Smith diagnosed Plaintiff with organic brain dysfunction and cognitive disorder, and estimated his Global Assessment of Functioning ("GAF") score at 65-70. Tr. 221-222.

In a Mental Residual Functional Capacity ("RFC") Questionnaire, Dr. Smith gave Plaintiff a fair prognosis. Tr. 224. He noted that Plaintiff suffered from difficulty thinking/concentrating, easy distractibility, memory impairment, sleep disturbance, and psychological or behavioral abnormalities associated with a dysfunction of the brain with a specific organic factor. Tr. 224. As

a result, he found that Plaintiff would be unable to maintain attention for two-hour segments, maintain regular attendance and be punctual within customary, usually strict tolerances, sustain an ordinary routine without special supervision, complete a normal workday and workweek without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and understand, remember, and carry out detailed instructions.  Tr. 225.  Additionally, he found that Plaintiff would be seriously limited, but not precluded, in his ability to remember work-like procedures, understand, remember, and carry out short and simple instructions, make simple work-related decisions, respond appropriately to changes in a routine work setting, deal with normal work stress, be aware of normal hazards and take appropriate precautions, set realistic goals or make plans independently of others, and deal with the stress of semiskilled and skilled work.  Tr. 225.  He found either slight or no limitation in all other areas.  Tr. 225.

Plaintiff presented to Mountain Home Christian Clinic ("MHCC") on November 4, 2004, with complaints of chronic pain and arthritis since his accident.  Tr. 227-231.  Upon examination, Plaintiff had normal musculature and development of the chest, with no deformity.  Tr. 229.  Lung sounds were full.  Tr. 229.  He had some intercostal tenderness of the anterior ribs and sternal junction on the right, but no crepitus.  Tr. 229.  Plaintiff was prescribed Ultram and Indocin.  Tr. 229.  On December 7, 2004, Plaintiff requested a prescription for Percocet.  Tr. 228.  Paul Wilbur, M.D., stated that he could not prescribe Percocet, but noted that he did believe Plaintiff was in pain.  Tr. 228.  He advised Plaintiff to apply for Medicaid or to see a specialist about the possibility of surgical intervention.  Tr. 228.  On February 3, 2005, Michael S. Hagaman, M.D., noted that Plaintiff's chest was clear and his heart had a regular rate and rhythm.  Tr. 239.  He also noted that Plaintiff did not

"appear to be in a whole lot of discomfort."  Tr. 239.  Plaintiff was given refills of Indocin and

Ultram, and encouraged to go to the Pain Clinic in Springfield.  Tr. 227, 239.  On June 24, 2005, Dr.

Wilbur noted that Plaintiff appeared depressed.  Tr. 241.  Dr. Wilbur refilled Plaintiff's prescription

for Ultram and also placed him on Lexapro for depression.  Tr. 241.  He suggested that Plaintiff

make an appointment at University of Arkansas for Medical Sciences for a surgical evaluation, but

noted there was little else the clinic could do for him.  Tr. 241.

On January 13, 2006, Plaintiff saw Veryl D. Hodges, D.O., for a consultative physical

evaluation.  Tr. 273-279.  Plaintiff related the history of his automobile accident and complained of

memory problems, headaches, blurred vision, confusion, and chronic pain.  Tr. 273.  Mentally,

Plaintiff complained of depression, mood swings, and a temper.  Tr. 274.  His medications included

Percocet, Ultram, Lexapro, and Indomethacin.  Tr. 274.

Upon examination, Plaintiff had well-healed scars over his left eyelid and left cheek, but no

other traumatic head injury.  Tr. 274.  Plaintiff's heart rate and rhythm were normal, without

murmurs, clicks, or rubs.  Tr. 274.  His lungs were clear, without rales, rhonchi, or wheezes.  Tr. 274.

Dr. Hodges noted that Plaintiff's upper extremity muscle mass was greater than "would be

anticipated in an individual who had been out of work or unable to work for a year."  Tr. 275.

Examination of Plaintiff's thorax revealed point tenderness at the costochondral margins of the

sternum, especially at the manubrium at the fourth and fifth rib connections, with more tenderness

on the left.  Tr. 275.  No pain was elicited on lateral and posterior palpation of the chest wall, but

tenderness was noted upon palpation of the sternum.  Tr. 275.  A small amount of step-off was noted

in the distal portion of the sternum and the xiphoid process was slightly elevated.  Tr. 275.  No

crepitus or immobility of the sternum was noted, and Plaintiff was unable to make his ribs "pop and

crack." Tr. 275.  Plaintiff's neurological examination was normal.  Tr. 275.  He could heel-to-toe

walk with a little difficulty.  Tr. 275.  A Romberg's test was negative, although Tinel's sign was

positive in the left radius.  Tr. 275.  Dr. Hodges assessed Plaintiff with costochondritis.  Tr. 275.

      In a Medical Source Statement (Physical), Dr. Hodges found that Plaintiff could occasionally

lift/carry 25 pounds, frequently lift/carry 25 pounds, stand/walk/sit for an unlimited time, and

push/pull an unlimited amount in an eight-hour workday. Tr. 277.  He also found that Plaintiff could

frequently climb, balance, kneel, crouch, crawl, and stoop.  Tr. 278.  Dr. Hodges found no

manipulative, visual, communicative, or environmental limitations.  Tr. 279-279.

      On September 8, 2008, Plaintiff saw Stephen R. Harris, Ph.D., for a psychological evaluation.

Tr. 513-520.  He reported residual chest pain from his accident, as well as memory impairment,

panic attacks, and depression.  Tr. 514.  He stated his pain level was at a four to five most of the

time.  Tr. 514.  Plaintiff was reportedly receiving treatment at Ozark Counseling Services.  Tr. 514.

Upon examination, Plaintiff was alert and oriented times four.  Tr. 515.  He appeared somewhat

depressed with a slightly dysphoric affect.  Tr. 514.  Thought processes were spontaneous and

reasonably well-organized.  Tr. 514.  Thought content was notable for feelings of persecution.  Tr.

515.  Plaintiff denied suicidal ideation, homicidal ideation, and hallucinations.  Tr. 515.

      After performing various tests, Dr. Harris concluded Plaintiff was within the average range

of intelligence. Tr. 516.  He assessed Plaintiff with pain disorder associated with both psychological

factors and a general medical condition and adjustment disorder with mixed anxiety and depressed

mood.  Tr. 516.  Dr. Harris estimated Plaintiff's GAF score at 52.  Tr. 516.  He noted some

difficulties in social interaction and found that Plaintiff may be "somewhat irritable" in situations

where he must perform basic work-like tasks, although he was intellectually capable of doing so.

Tr. 516-517. He also noted some difficulties in the area of concentration, but observed no difficulties in Plaintiff's persistence. Tr. 517. Dr. Harris further noted that Plaintiff was capable of performing tasks in an acceptable time frame unless he felt restrained by physical problems. Tr. 517.

In a Medical Source Statement (Mental), Dr. Harris found mild to moderate impairment in Plaintiff's ability to interact appropriately with the public, supervisors, and co-workers, and mild impairment in his ability to carry out simple instructions, make judgments on simple work-related decisions, understand, remember, and carry out complex instructions, make judgments on complex work-related decisions, and respond appropriately to usual work situations and to changes in a routine work setting. Tr. 518-520. Dr. Harris found no other limitations. Tr. 518-520.

On September 11, 2008, Plaintiff saw K. Simon Abraham, M.D., for a consultative physical examination. Tr. 521-533. At the time, Plaintiff was taking Klonopin and an antidepressant. Tr. 521. Plaintiff reportedly took care of himself and stated he could walk a mile or two. Tr. 521. He complained of continuous chest pain. Tr. 522. Upon examination, Dr. Abraham noted that Plaintiff was healthy, fit, strong, and muscular. Tr. 522. He noted that Plaintiff moved with ease and was comfortable sitting up and lying flat. Tr. 522. Plaintiff's breath sounds were normal and he exhibited no hyper-resonance, prolonged expiration, or wheezing. Tr. 523. Range of motion was normal in Plaintiff's shoulders, elbows, wrists, hands, hips, knees, ankles, and cervical and lumbar spine. Tr. 523. Plaintiff showed no signs of neurological deficit or muscle weakness or atrophy. Tr. 524. Gait and coordination were normal. Tr. 524. Plaintiff could stand and walk without assistance devices, walk on his heels and toes, and squat/arise from a squatting position. Tr. 524. Dr. Abraham assessed Plaintiff with pain in his anterior chest wall, upper thoracic spine, and left knee, and noted possible depression. Tr. 525. He specifically stated that Plaintiff was able to perform all of the

-11-

requested activities "without any pain or discomfort" and found nothing "that would preclude [Plaintiff] from gainful employment."  Tr. 525-526.

In a Medical Source Statement (Physical), Dr. Abraham found that Plaintiff could occasionally lift/carry 11-20 pounds, sit for three hours at once and two hours total per day, stand for two hours at once and two hours total per day, and walk for one hour at once and one hour total per day. Tr. 496-500, 527-533. Dr. Abraham determined Plaintiff could never reach, handle, finger, feel, or push/pull due to chest pain.  Tr. 498, 529.  He found that Plaintiff could frequently operate foot controls with both feet. Tr. 498, 529. Posturally, Dr. Abraham determined Plaintiff could never stoop, but could occasionally climb stairs, ramps, ladders, or scaffolds, and balance, kneel, crouch, and crawl.  Tr. 499, 530.  He found no visual or communicative limitations.  Tr. 499, 530.

On April 6, 2009, Plaintiff saw Dr. Smith for a second psychological evaluation.  Tr. 535-544.  Upon examination, Plaintiff was oriented in all spheres.  Tr. 535.  His memory was impaired, but his judgment and insight were grossly intact.  Tr. 535.  Plaintiff's mood was mildly dysthymic and his affect was muted and rigid.  Tr. 535.  His narratives were marginally fluent but informative. Tr. 535.  On the Wechsler Adult Intelligence Scale-Revised, Plaintiff received a verbal IQ of 92, a performance IQ of 93, and a full-scale IQ of 92. Tr. 536. Dr. Smith assessed Plaintiff with cognitive dysfunction, non-psychotic, secondary to a general medical condition, traumatic brain injury (per patient history), and chronic, non-psychogenic pain disorder.  Tr. 538.  It was Dr. Smith's opinion that Plaintiff was totally disabled.  Tr. 537.  In a Mental RFC Questionnaire, Dr. Smith estimated Plaintiff's GAF score at 35-40.  Tr. 539.  He found that Plaintiff was seriously limited in fifteen work-related categories and unable to meet competitive standards in ten work-related categories. Tr. 541-542.

III.   **Applicable Law**

The Court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir. 2003). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support a conclusion." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). In determining whether evidence is substantial, the Court considers both evidence that detracts from the Commissioner's decision as well as evidence that supports it. *Craig v. Apfel*, 212 F.3d 433, 435-36 (8th Cir. 2000) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). If, after conducting this review, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [Secretary's] findings," then the decision must be affirmed. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (quoting *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995)).

To be eligible for disability insurance benefits, a claimant has the burden of establishing that he is unable to engage in any substantial gainful activity due to a medically determinable physical or mental impairment that has lasted, or can be expected to last, for no less than twelve months. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. § 423(d)(1)(A). The Commissioner applies a five-step sequential evaluation process to all disability claims: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits his physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a disabling impairment listed in the regulations; (4) whether the claimant has the RFC to perform his past relevant work; and (5) if the claimant cannot perform his past work, the burden of production then shifts to the Commissioner

-13-

to prove that there are other jobs in the national economy that the claimant can perform given his age, education, and work experience. *Pearsall*, 274 F.3d at 1217; 20 C.F.R. § 404.1520(a), 416.920(a). If a claimant fails to meet the criteria at any step in the evaluation, the process ends and the claimant is deemed not disabled. *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004).

## IV.   **Discussion**

At step one, the ALJ determined Plaintiff had not engaged in substantial gainful activity at any point since November 23, 2003, the alleged onset date. Tr. 348. At step two, the ALJ found that Plaintiff suffered from residuals from a fractured sternum and mood disorders, which were considered severe impairments under the Act. Tr. 348-349. At step three, he determined Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment. Tr. 349-350. At step four, the ALJ found that Plaintiff had the RFC to lift/carry twenty pounds occasionally and ten pounds frequently, sit, stand, and walk for six hours in an eight-hour workday, occasionally reach overhead and frequently reach in all other directions, frequently grasp, finger, feel, and operate hand and foot controls, and occasionally climb, crawl, balance, kneel, crouch, and stoop. Tr. 350-355. Additionally, the ALJ found that Plaintiff had moderate restrictions in his ability to maintain social functioning, maintain concentration, persistence, and pace, understand, remember, and carry out detailed instructions, respond appropriately to usual work situations and routine work changes, and interact appropriately with supervisors, the public, and co-workers. Tr. 350-355. The ALJ further determined Plaintiff could perform work where interpersonal contact is incidental to the work performed, complexity of tasks is learned and performed by rote, with few variables and little judgment, and the supervision required is simple,

-14-

direct, and concrete.  Tr. 350-355.

After eliciting vocational expert testimony, the ALJ determined there were light, unskilled jobs existing in significant numbers in the national economy that Plaintiff could perform, including representative occupations such as cafeteria attendant, of which there are 50,267 jobs nationally and 200 jobs locally, housekeeper, of which there are 30,529 jobs nationally and 300 jobs locally, and escort vehicle driver, of which there are 32,960 jobs nationally and 350 jobs locally.  Tr. 356, 492-495.  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Act, at any point from November 23, 2003, through December 16, 2009.  Tr. 356-357.

On appeal, Plaintiff contends the ALJ erred by: (1) failing to find his diagnoses of organic brain disorder and cognitive dysfunction to be severe; (2) improperly dismissing Dr. Smith's opinion; (3) improperly determining his RFC; and (4) discrediting his subjective complaints.  *See* Pl.'s Br. 17-29.

A.  Plaintiff's Severe Impairments

Plaintiff contends the ALJ erred at step two of the sequential analysis by failing to find his cognitive dysfunction/organic brain syndrome to be severe.  *See* Pl.'s Br. 25-27.  Step two of the regulations involves a determination, based on the medical evidence, whether the claimant has an impairment or combination of impairments that is severe.  *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A severe impairment is one which significantly limits a claimant's physical or mental ability to perform basic work activities.  20 C.F.R. § 404.1520(c).  The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have "no more than a minimal impact on her ability to work." *Caviness v. Massanari,* 250 F.3d 603, 605 (8th Cir.2001), *citing Nguyen v. Chater,* 75 F.3d 429, 430-31 (8th

Cir.1996).  Although the Plaintiff has the burden of establishing a severe impairment or impairments, the burden at this stage is not great.  *Caviness*, 250 F.3d at 605.

The Court finds no error in the ALJ's determination that Plaintiff's cognitive dysfunction/organic brain syndrome is non-severe.  The ALJ provided explicit reasons for giving little weight to Dr. Vann Smith's mental evaluation, namely that Dr. Smith's opinion was inconsistent both internally and as compared with the medical evidence as a whole.  Tr. 354. Additionally, it appears that Dr. Smith relied heavily and unquestioningly on the Plaintiff's subjective report of his symptoms rather than objective medical reports.  Specifically, Dr. Smith determined Plaintiff suffered from "significant closed head trauma" as a result of his four wheeler accident, despite documented evidence that Plaintiff denied loss of consciousness and only sustained lacerations to his cheek and eye.  Tr. 121, 535.  Moreover, Dr. Smith found that Plaintiff had a history of "steadily worsening neurocognitive/emotive symptoms."  Tr. 535.  However, in the five years that elapsed between Dr. Smith's first and second evaluations, Plaintiff's IQ scores remained stable and demonstrated average intelligence.  Tr. 219, 539.  Finally, the ALJ noted that Plaintiff had never before sought medical treatment from a  neuropsychologist, and surmised that this was an attempt to generate evidence for the current appeal.  Tr. 354; *see Page v. Astrue,* 484 F.3d 1040, 1043 -44 (8th Cir. 2007); *Shannon v. Chater,* 54 F.3d 484, 486 (8th Cir.1995) (doctor's visit linked primarily to obtaining benefits rather than medical treatment)).  These are all valid reasons to attach less significance to Dr. Smith's opinion.  As such, the Court finds no error in the ALJ's severity determination.

B.  Dr. Smith's Opinion

Plaintiff next asserts that the ALJ demonstrated bias in weighing and dismissing Dr. Smith's

opinion. *See* Pl.'s Br. 22-25. This Court disagrees. First, Dr. Smith only evaluated Plaintiff twice

during a span of five years. *See Holmstrom v. Massanari*, 270 F.3d 715, 720-721 (8th Cir. 2001)

(ALJ properly discounted treating physicians' opinions as to claimant's RFC, in part because they

were based on a relatively short-term treatment relationship). Additionally, as previously discussed,

the ALJ properly determined that Dr. Smith's findings were internally inconsistent as well as

inconsistent with the medical evidence as a whole. Tr. 354;  Plaintiff had never before sought

treatment for or exhibited symptoms consistent with cognitive dysfunction. *See Kirby v. Astrue*, 500

F.3d 705, 708-09 (8th Cir. 2007). Moreover, it appears that Plaintiff saw Dr. Smith to bolster his

claim for disability benefits rather than to obtain medical treatment. *See Shannon*, 54 F.3d at 486.

The ALJ properly took these considerations into account when determining what weight to give Dr.

Smith's opinion.

The court also dismisses Plaintiff's claim of unfair bias or prejudice exhibited by the ALJ

against Dr. Smith. In considering Dr. Smith's opinion, the ALJ specifically stated, "such evidence

is certainly legitimate and deserves due consideration." Tr. 354-355. Additionally, Plaintiff has

offered no specific evidence of bias. *See Kittler v. Astrue*, 231 Fed. Appx. 524, 525 (8th Cir. 2007)

(citing *Rollins v. Massanari*, 261 F.3d 853, 857-58 (8th Cir. 2001) (plaintiff did not overcome

presumption that ALJ was unbiased)). Accordingly, we reject Plaintiff's conclusory allegation of

prejudice.

C.  Plaintiff's RFC

Plaintiff argues that the ALJ erred in his RFC assessment. Pl.'s Br. 17-19. At the fourth step

of the evaluation, a disability claimant has the burden of establishing his RFC. *Eichelberger*, 390

F.3d at 591; *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). A claimant's RFC is the

most he can do despite his limitations.  20 C.F.R. § 404.1545(a)(1).  The ALJ determines a claimant's RFC based on "all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Masterson*, 363 F.3d at 737.  The Eighth Circuit has stated that "a claimant's residual functional capacity is a medical question." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001).  Thus, although the ALJ bears the primary responsibility for determining a claimant's RFC, there must be "some medical evidence" to support the ALJ's determination.  *Eichelberger*, 390 F.3d at 591; *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir 2000).

### (1) Physical Limitations

Substantial evidence supports the ALJ's RFC determination.  Although Plaintiff experienced complications following his four wheeler accident, the objective medical evidence suggests that Plaintiff's sternal fracture improved with treatment and medication.  *See Schultz v. Astrue*, 479 F.3d 979, 983 (8th Cir. 2007) (an impairment that can be controlled by treatment is not considered disabling).  By February 20, 2004, Plaintiff's breathing and chest pain had improved.  Tr. 203.  An ECG yielded normal results.  Tr. 205.  An MRI of Plaintiff's chest dated May 2004 revealed no apparent fractures, subluxations, edema, destructive lesions, and no masses or hematomas.  Tr. 272.  In July 2004, a physical examination revealed no deformity, stepoff, or clicking.  Tr. 253.  Although Plaintiff claimed he could "pop his ribs," Dr. Gocio was unable to reproduce the sound.  Tr. 253.  Tomography revealed no fractures, but some calcification and changes in the costal cartilages.  Tr. 213, 258.  A bone scan revealed increased activity involving the sternomanubrial joint and the mid and lower portion of the sternum.  Tr. 211-212, 259.  Dr. Gocio concluded that Plaintiff's pain was likely related to disrupted cartilage and stated he could offer nothing surgical to alleviate the

-18-

problem.  Tr. 211.  He recommended continued treatment with NSAIDs.  Tr. 211.  At MHCC,

Plaintiff was prescribed Ultram and Indocin for pain.  Tr. 229.  On December 7, 2004, Dr. Wilbur

noted that he did believe Plaintiff was in pain.  Tr. 228.  However, on February 3, 2005, Dr.

Hagaman noted that Plaintiff did not "appear to be in a whole lot of discomfort."  Tr. 239.

Consultative evaluations also do not support the level of pain Plaintiff alleges.  Dr. Hodges

noted that Plaintiff's upper extremity muscle mass was greater than "would be anticipated in an

individual who had been out of work or unable to work for a year."  Tr. 275.  Examination of

Plaintiff's thorax revealed point tenderness at the costochondral margins of the sternum.  Tr. 275.

No pain was elicited on lateral and posterior palpation of the chest wall, but tenderness was noted

upon palpation of the sternum.  Tr. 275.  A small amount of step-off was noted in the distal portion

of the sternum and the xiphoid process was slightly elevated.  Tr. 275.  No crepitus or immobility

of the sternum was noted, and Plaintiff was unable to make his ribs "pop and crack."  Tr. 275.

Similarly to Dr. Hodges, Dr. Abraham noted that Plaintiff appeared healthy, fit, strong, and

muscular.  Tr. 522.  He noted that Plaintiff moved with ease and was comfortable sitting up and lying

flat.  Tr. 522.  Plaintiff's breath sounds were normal and he exhibited no hyper-resonance, prolonged

expiration, or wheezing.  Tr. 523.  Range of motion was normal in Plaintiff's shoulders, elbows,

wrists, hands, hips, knees, ankles, and cervical and lumbar spine.  Tr. 523.  Plaintiff showed no signs

of neurological deficit or muscle weakness or atrophy.  Tr. 524.  Gait and coordination were normal.

Tr. 524.  Plaintiff could stand and walk without assistance devices, walk on his heels and toes, and

squat/arise from a squatting position.  Tr. 524.  Dr. Abraham specifically stated that Plaintiff was

able to perform all of the requested activities "without any pain or discomfort" and found nothing

"that would preclude [Plaintiff] from gainful employment."  Tr. 525-526.

Plaintiff draws the Court's attention to Dr. Gocio's and Dr. Wilbur's notes that he experienced legitimate pain. Tr. 211, 227. This issue is not in dispute. Plaintiff undoubtedly experiences pain. However, his physical examinations, medical records, and lack of ongoing treatment are simply inconsistent with the amount of pain alleged. Furthermore, although Dr. Gaston opined in his December 2003 letter that Plaintiff's prognosis for working within the next year was poor, he did not treat Plaintiff after January 5, 2004, and was not in the best position to judge Plaintiff's recovery. For these reasons, the Court finds no error in the ALJ's physical RFC determination.

### (2) Mental Limitations

Substantial evidence similarly supports the ALJ's mental findings. For reasons already thoroughly discussed, the ALJ properly discredited Dr. Smith's opinion. Moreover, although Plaintiff was prescribed Lexapro, he did not report psychological symptoms until June 24, 2005, over a year and a half after his alleged onset date, and sought very little, if any, treatment during the relevant time period. Tr. 241. Plaintiff's lack of mental health treatment undermines his overall credibility. *See Kirby v. Astrue*, 500 F.3d 705, 708-09 (8th Cir. 2007) (claimant never sought formal treatment by a psychiatrist, psychologist, or other mental health care professional). For these reasons, the Court finds no error in the ALJ's mental RFC determination. Accordingly, we find that the ALJ's RFC assessment properly reflects Plaintiff's physical and mental limitations.

### D.  Subjective Complaints

Lastly, Plaintiff contends the ALJ improperly dismissed his subjective allegations of pain. *See* Pl.'s Br. 19-22. When evaluating a claimant's subjective allegations, the ALJ must consider all evidence relating to: (1) the claimant's daily activities; (2) the duration, frequency and intensity of

the pain; (3) any precipitating and aggravating factors; (4) the dosage, effectiveness and side effects of medication; and (5) any functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ "may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them." *Medhaug v.* Astrue, 578 F.3d 805, 816 (8th Cir. 2009) (quoting *Goff*, 421 F.3d at 792). However, subjective complaints may be discounted if there are inconsistencies in the medical evidence as a whole. *Id.* A court "will not disturb the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's complaints of disabling pain." *Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006) (quoting *Goff*, 421 F.3d at 792).

Contrary to Plaintiff's assertion, the ALJ dismissed his subjective complaints for legally sufficient reasons. The ALJ cited Plaintiff's lack of ongoing medical treatment, failure to take prescription pain medication, and the lack of objective medical corroboration as evidence that his limitations were not of disabling severity. Tr. 353-354; *Davis v. Barnhart*, 197 Fed. Appx. 521, 522 (8th Cir. 2006) (ALJ properly considered medical records, lack of treatment, and failure to take prescription pain medication when discounting her subjective complaints)*; Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999) (absence of objective medical evidence to support claimant's complaints). Other than appearing for scheduled consultative evaluations, Plaintiff did not seek any medical treatment after June 2005. Tr. 241. Additionally, despite Plaintiff's alleged level of pain, he testified that he was no longer taking any prescription or over-the-counter pain medications. Tr. 412; *Novotny v. Chater*, 72 F.3d 669, 671 (8th Cir. 1995) (claimant failed to seek regular or sustained medical treatment and was not taking prescription pain medication at the time of the administrative hearing). Finally, although Plaintiff testified that he could not afford the cost of treatment or medication, the

evidence shows that he sought and received treatment at MHCC and Ozark Counseling Services, both of which are known for providing treatment to the uninsured.[1]  Tr. 403; s*ee Clark v. Shalala*, 28 F.3d 828, 831 n. 4 (8th Cir. 1994) (ALJ properly discounted claimant's subjective complaints when he failed to provide evidence of refusal of services due to lack of financial resources).

It is well-settled that an ALJ need not explicitly discuss each *Polaski* factor; it is "sufficient if he acknowledges and considers those factors before discounting a claimant's subjective complaints."  *Heino v. Astrue*, 578 F.3d 873, 881 (8th Cir. 2009) (quoting *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004)).  Here, the ALJ cited the proper standard, considered the factors in conjunction with Plaintiff's testimony, and then properly discounted Plaintiff's subjective complaints.  *Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) ("we defer to an ALJ's credibility determinations if they are supported by valid reasons and substantial evidence").  For these reasons, substantial evidence supports the ALJ's decision to discredit Plaintiff's subjective complaints.

## V.   Conclusion

Having carefully reviewed the record, the undersigned finds that substantial evidence supports the ALJ's determinations at each step of the disability evaluation process, and thus the decision should be affirmed.  Accordingly, Plaintiff's complaint should be dismissed with prejudice.

IT IS SO ORDERED this 8th day of June 2011.

/s/ J. Marschewski
HON. JAMES R. MARSCHEWSKI
CHIEF U.S. MAGISTRATE JUDGE

---

[1] Health Resources of Arkansas acquired Ozark Counseling Services and all associated client records.  Tr. 506.  As a result, Plaintiff's counseling records could not be located.  Tr. 506.